# United States Court of Appeals
# for the Federal Circuit

---

**MERIDIAN ENGINEERING COMPANY,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-1584

---

Appeal from the United States Court of Federal Claims in No. 1:11-cv-00492-SGB, Chief Judge Susan G. Braden.

---

Decided: March 20, 2018

---

MARIA L. PANICHELLI, Cohen Seglias Pallas Greenhall & Furman PC, Philadelphia, PA, argued for plaintiff-appellant. Also represented by MICHAEL H. PAYNE.

ERIC LAUFGRABEN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., ALLISON KIDD-MILLER; JOHN FRANCIS BAZAN, SR., United States Army Corps of Engineers, Los Angeles, CA.

---

Before PROST, *Chief Judge,* REYNA and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Meridian Engineering Company ("Meridian") appeals two final decisions of the U.S. Court of Federal Claims determining, inter alia, that (1) Meridian did not meet standards of proof to show that the United States ("Government") breached certain contractual obligations and its duty of good faith and fair dealing in a dispute under the Contract Disputes Act, 41 U.S.C. §§ 601−613 (2006) ("CDA") related to the construction of a flood control project in Nogales, Arizona, *see Meridian Eng'g Co. v. United States (Meridian I)*, 122 Fed. Cl. 381, 384, 400 n.25, 426 (2015); J.A. 3000−53 (Second Amended Complaint), and (2) Meridian was owed certain monies for equitable adjustment and interest on the payments running from the date Meridian submitted its claim, January 7, 2014, *see Meridian Eng'g Co. v. United States (Meridian II),* 130 Fed. Cl. 147, 172 (2016). We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012). We affirm-in-part, vacate-in-part, reverse-in-part, and remand.

BACKGROUND[1]

In 2007, Meridian entered into a contract with the Government to construct flood control structures, referred to as the Chula Vista Project. *Meridian I*, 122 Fed. Cl. at 385−86. The Project contemplated construction of several concrete channels, relocation of a sewer line, and dewatering and water diversion. *See* J.A. 1044−627 (Contract).

---

[1]   The undisputed facts and procedural history of this case are extensive and are described in full in *Meridian I*. *See* 122 Fed. Cl. at 385−97. We provide here only a brief summary of the relevant facts and procedural history necessary to resolve this appeal.

After commencing the Project, Meridian encountered a series of problems relating primarily to what it deemed "subsurface organic/unsuitable material," specifically, "a layer of dripping saturated dark clay material under which a clean layer of sand is producing water" that had "the potential for serious structural damage." J.A. 1810; *see Meridian I*, 122 Fed. Cl. at 388 (describing "softer-than-anticipated soils"), 390−92 (describing modifications pursuant to discovery of "saturated soils"). Meridian notified the Government about these problems, and the Government issued several Contract modifications in response. *See Meridian I*, 122 Fed. Cl. at 388−90 (describing modifications for increase in allotted funds for larger pipe size, addition of a reinforced concrete access ramp, investigation of soil properties, remediation of saturated soils, and additional sheet piling). Eventually, the Government directed Meridian to suspend work on the Project in January 2009 following a series of structural failures, *see* J.A. 3127−28, and, while minor work continued, the Government ultimately terminated the Project following a September 2009 final inspection of the Project site, *see Meridian I*, 122 Fed. Cl. at 394−96.

Following the parties' disagreements over payment owed to Meridian, Meridian filed suit in the Court of Federal Claims for breach of contract, breach of the duty of good faith and fair dealing, and a violation of the CDA. *See* J.A. 127, 3000−53. The Government conceded liability for costs relating to three counts of Meridian's Second Amended Complaint (Counts VII−IX), which were the subject of a separate damages trial. *See* J.A. 3032−36 (Count VII (Suspension of Work), Count VIII (Channel Fill), Count IX (Interim Protection)). *See generally Meridian II*, 130 Fed. Cl. 147. Because the Government now

concedes the only issue with respect to *Meridian II*,[2] the remainder of this opinion addresses determinations from *Meridian I*.

## DISCUSSION

### I. Standard of Review

We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error. *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1353 (Fed. Cir. 2006), *aff'd* 552 U.S. 130 (2008). "A finding may be held clearly erroneous when the appellate court is left with a definite and firm conviction that a mistake has been committed." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (internal quotation marks, ellipsis, and citation omitted).

### II. CDA Claims

Meridian asserts that the Court of Federal Claims erred when it "reasoned that only Meridian's breach of contract and breach of good faith and fair dealing claims

---

[2] Both parties agree that the Court of Federal Claims erred in setting the date from which interest accrued at January 7, 2014. *See* Appellant's Br. 61−62; Appellee's Br. 60. Interest accrues from the date that the contracting officer ("CO") receives a claim. *See* 41 U.S.C. § 7109(a)(1) (2012) ("Interest on an amount found due a contractor on a claim shall be paid to the contractor for the period beginning with the date the [CO] receives the contractor's claim . . . until the date of payment of the claim."). Here, accrual commenced on January 7, 2011. *See* J.A. 2511. We reverse *Meridian II* with respect to the date of interest accrual with instructions for the court to enter the correct accrual date as January 7, 2011, and recalculate the amount of interest in accordance with the correct accrual date.

presented a viable cause of action," because "Meridian's CDA claims should have been analyzed under the framework contemplated by the CDA, and not under the rubric of a 'breach' claim." Appellant's Br. 23, 24 (capitalization modified). However, Meridian does not explain the alternate CDA framework to which it refers, nor does it state how analysis under a different hypothetical framework would result in a finding in its favor. *See id.* at 22−25 (stating only that the use of the breach of contract standard "skewed" the Court of Federal Claims' analysis).

"The[] requirements of the CDA are jurisdictional prerequisites to any appeal." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010) (citation omitted); *see K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015) (reviewing de novo whether the Court of Federal Claims had jurisdiction under the CDA). Pursuant to the CDA, a party must submit a "valid claim," which is defined by regulation as a demand seeking "as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." *M. Maropakis*, 609 F.3d at 1327 (quoting 48 C.F.R. § 33.201[3]). Thus, the CDA itself does not provide a cause of action to which money damages may accrue; it is the claim asserted pursuant to the CDA that is the source of potential damages and review by the trier of fact. *See Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1112 (Fed. Cir. 2013) (explaining the prerequisites for a valid claim brought under the CDA, which is a jurisdictional requirement to obtain relief). Therefore, the Court of Federal Claims did not err

---

[3] Recodified at Federal Acquisition Regulation ("FAR") 2.101 (2002); *see* Federal Acquisition Regulation; Definition of 'Claim' and Terms Relating to Termination, 67 Fed. Reg. 43,513, 43,513 (June 27, 2002).

in finding it had jurisdiction under the CDA to evaluate Meridian's breach of contract claims.

### III. The Court of Federal Claims Did Not Err in Its Differing Site Conditions Analysis (Counts II and V)

The Court of Federal Claims found that Meridian did not offer sufficient evidence to satisfy its Type I differing site condition ("DSC") claim alleging that in the channel and sewer line areas of the project the unexpected conditions of "soupy" soil caused delays and imposed unanticipated costs.[4] *Meridian I*, 122 Fed. Cl. at 403; *see id.* at 408−09. Meridian posits several errors in the Court of Federal Claims' analysis.[5] *See* Appellant's Br. 27−40. After articulating the applicable legal standard, we address each argument in turn.

---

[4] Meridian's DSC claim originates from the standard "differing site conditions" clause located in the Contract pursuant to FAR 52.236-2(a) (2017). *See* J.A. 1150−51.

[5] For example, Meridian argues that the Court of Federal Claims only addressed Count V's DSC claim with respect to the sewer relocation work but "wholly failed to address Meridian's Count II [DSC] claim" related to the area of construction around the concrete channels. Appellant's Br. 40 (capitalization modified). Meridian is incorrect. The Court of Federal Claims noted at the start of its DSC analysis that, "because the parties' briefs jointly discuss [DSC] and sewer relocation, the court addresses Counts [II] and [V] together." *Meridian I*, 122 Fed. Cl. at 402 n.27; *see id.* at 402 (discussing Counts II and V jointly under a common heading "Whether Meridian Is Entitled to Costs for [DSC] in the Channel and at the Sewer Line" (capitalization modified)).

## A. Legal Standard

"A Type I [DSC claim] arises when the conditions encountered differ from what was indicated in the contract documents." *Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1376 (Fed. Cir. 2007); *see* FAR 52.236-2(a)−(b) ("The Contractor shall promptly . . . give a written notice to the [CO] of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract. . . . The [CO] shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause . . . .").[6] To prevail on a Type I DSC claim, a contractor must prove that: (1) "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions"; (2) "the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents" (i.e., reasonable foreseeability); (3) "the particular contractor in fact relied on the contract representation"; and (4) "the conditions differed materially from those represented and . . . the contractor suffered damages as a result." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348−49 (Fed. Cir. 2008). "Determining whether a contract contained indications of a particular site condi-

---

[6] It "is distinguished from a Type II [DSC claim], which arises when the conditions encountered are of an unusual nature and differ materially from those normally encountered in the kind of work contemplated by the contract." *Renda Marine*, 509 F.3d at 1376 (citing FAR 52.236-2(a)−(b)).

tion is a matter of contract interpretation" that we review de novo. *Id.* at 1350 (internal quotation marks and citation omitted).

## B. Meridian Has Not Shown a Type I Differing Site Condition

The Court of Federal Claims found in relevant part that Meridian's interpretation of the Contract was not reasonable, and that the existence of subsurface saturated soil conditions was "reasonably foreseeable." *Meridian I*, 122 Fed. Cl. at 409; *see id.* at 408−09. Specifically, the Court of Federal Claims first found that the specification stated that "[w]ater in varying quantities may be flowing in natural washes throughout the length of the project," and "[t]he work site may be inundated because of [water] runoff," *id.* (quoting J.A. 1629, 1630), such that "a reasonable contractor would interpret the Specification as representing water as a site condition," *id* at 409. As for the second element of reasonable foreseeability, the Court of Federal Claims found that the original drawings in the Contract showed saturated soil and that the worksite was located on a floodplain, and a reasonable contractor would have conducted a site visit which would have alerted the contractor to the subsurface saturated soil conditions, such that "the actual conditions at the site were reasonably foreseeable." *Id.* (citing J.A. 1664, 1725−26, 1729).

We see no error in the Court of Federals Claims' findings with respect to the first two elements of a Type I DSC claim.[7]  As noted by the Court of Federal Claims,

---

[7]  Meridian's arguments related to the third and fourth elements of the Type I DSC claim—reliance in fact and material differences—are "premised on the [Court of Federal Claims'] erroneous conclusions regarding [the second element of reasonable foreseeability]." Appellant's Br. 39 (capitalization modified).  We may affirm the Court

several instances in the Specification and accompanying drawings indicate the potential presence of water and saturated soil. *See, e.g.*, J.A. 1664, 1725−26; *see also* J.A. 1729, 3274−76, 3286, 3367−68. Boring logs that accompanied the Contract also recorded sub-surface conditions near the boring holes that were "silty clay, with sand, black, wet, medium to high plasticity, [and] soft." J.A. 1652; *see* J.A. 1653−63 (recording similar descriptions in additional boring hole logs). Further, the boring hole logs stated that "variations may exist in the subsurface between boring locations," J.A. 1736, and that the logs, which recorded boring log data from nearly two decades prior, "should not be construed as . . . defining construction conditions," J.A. 1651; *see, e.g.*, J.A. 1664 (dating boring excavations to 1989). Therefore, even though the Contract indicated "hard unyielding material" found at parts of the site, J.A. 1737, a "reasonable and prudent contractor would not have understood the [C]ontract documents as providing an affirmative indication of the subsurface conditions" to be non-saturated at the site, *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1347 (Fed. Cir. 1998); *see id.* at 1346−47 (finding no representation as to site conditions where both parties acknowledged the

---

of Federal Claims' holding that Meridian has not proven a DSC based on the failure of a single element of the DSC claim. *See Renda Marine*, 509 F.3d at 1378 (affirming denial of a DSC claim when contractor failed to establish the first two elements of its claim); *see also Int'l Tech. Corp.*, 523 F.3d at 1353 (affirming denial of a DSC claim based on failure to establish the first element "and, alternatively," failure to establish the second element). However, even if we were to review the third and fourth elements, because we affirm the Court of Federal Claims' determination with regard to the first and second elements, we would find that Meridian's conditional arguments on the third and fourth elements fail.

site contained highly variable subsurface conditions and finding boring holes taken in proximity to site but not directly in work zone that indicated certain conditions could not be representative of entire site); *see also Renda Marine*, 509 F.3d at 1378 (similar).

A reasonable and prudent contractor would have foreseen the saturated soil condition, based on the Contract documents and the fact that the actual conditions at the site indicated such conditions. *See H.B. Mac*, 153 F.3d at 1346 ("It is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed." (citation omitted)); *Meridian I*, 122 Fed. Cl. at 409 (relying on testimony from the Government's expert). The Government's expert stated not only that "[s]oft saturated soils with challenging groundwater conditions can be, and typically are, encountered when excavating in an active flood channel," J.A. 442, but also that a large presence of saturated soil was located "100 f[ee]t or so" away from where Meridian worked, J.A. 583. Meridian's President, Mark Sutton, acknowledged that he reviewed the boring logs and understood that certain dewatering efforts would need to take place before construction began. *See, e.g.*, J.A. 259–62. Moreover, Meridian presents nothing but unsworn attorney argument to rebut the Government's testimony that a site visit would have made a reasonable contractor aware of the saturated soil conditions, *see* Reply Br. 17; that is not evidence and cannot rebut the Government's admitted evidence, *see Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009). Therefore, we find the Court of Federal Claims did not err in finding no DSC with respect to the channel and sewer relocation area.

## C. Meridian's Counterarguments on Its Type I DSC Claim Are Unpersuasive

Meridian makes four primary arguments why we should find the Court of Federal Claims erred in finding

that "the actual conditions at the site were reasonably foreseeable,"[8] *Meridian I*, 122 Fed. Cl. at 409; *see* Appellant's Br. 26–39, all of which are unavailing.

First, Meridian contends that the Court of Federal Claims' review "was based on an improper interpretation of the Contract documents, which failed to give proper weight to [certain] geotechnical information." Appellant's Br. 29; *see id.* at 29−39. Specifically, Meridian alleges that the geotechnical information provided in the solicitation "indicated that there would be hard, unyielding materials in the excavation areas" rather than the discovered groundwater and clay materials. *Id.* at 31; *see, e.g.*, J.A. 1737 (providing Section 3.2 of the Specification stating certain areas of the Project contained "hard unyielding material").

Despite Section 3.2's language, the Court of Federal Claims noted several other portions of the Contract that indicated areas of the site contained saturated soil. *See Meridian I*, 122 Fed. Cl. at 409 (citing J.A. 1664, 1725−26 (portions of boring logs)). As discussed above, the boring logs reviewed by the Court of Federal Claims also revealed conditions of "silty clay, with sand, black, wet,

---

[8]    Meridian also contends that the Court of Federal Claims erred by determining "what specific representations the contract made" under the first element of the Type I DSC claim, i.e., what representations were made to a reasonable contractor, when that determination should have been made under the second element of the Type I DSC claim. *See* Appellant's Br. 27. However, Meridian does not allege this error would affect the disposition of the Court of Federal Claims' holding, nor does Meridian present any evidence in support of its argument. Accordingly, we find Meridian waived this undeveloped argument. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

medium to high plasticity, [and] soft." J.A. 1652; *see* J.A. 1653−63 (recording similar descriptions in additional boring hole logs); *see also H.B. Mac*, 153 F.3d at 1346 (considering boring log data on a case-by-case factual basis as part of the DSC analysis). Finally, Section 3.2, which is the same portion of the Specification that Meridian cites for the proposition that certain areas would contain hard, unyielding material, instructs that the contractor may encounter in certain areas "unstable material," J.A. 1739, defined as "materials too wet to properly support the utility pipe, conduit, or appurtenant structure," J.A. 1735. We cannot say that the Court of Federal Claims clearly erred in its determination that the subsurface soil conditions were reasonably foreseeable based on the Contract.

Second, Meridian contends that the Court of Federal Claims erred in not giving sufficient weight to Meridian's expert and witness testimony, which explained that Meridian relied on certain statements in the Specification in making its assessment. *See* Appellant's Br. 32−34 (describing reliance on Meridian's president, Mr. Sutton), 34–36 (asserting the findings of Meridian's expert, Dr. James W. Mahar, which it deems consistent with Mr. Sutton's conclusions that it was reasonable not to expect groundwater flows or clay materials at the site). We do not find clear error in the Court of Federal Claims' consideration of the expert and witness testimony. We have stated that "weighing of conflicting evidence is a task within the special province of the trial judge who, having heard the evidence, is in a better position than we to evaluate it." *Pac. Gas & Elec. Co. v. United States*, 668 F.3d 1346, 1353 (Fed. Cir. 2012) (internal quotation marks and citations omitted). Where "a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally

inconsistent, can virtually never be clear error." *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)). Here, the Court of Federal Claims reviewed testimony submitted by both parties. *See, e.g.*, *Meridian I*, 122 Fed. Cl. at 403 (reviewing parties' arguments with respect to testimony of Dr. Mahar), 409 (reviewing testimony of Mr. Sutton and the Government's expert Mr. Stephen G. Chickey).[9] It found the Government's proffered testimony to be more persuasive, and found that Mr. Sutton's testimony also demonstrated that Meridian had reviewed the boring log data that showed the boring holes had no bearing capacity due to saturated soils. *Id.* (citing J.A. 281–83). Meridian's argument that its proffered testimony should be more persuasive does not leave us with a "definite and firm conviction" that the Court of Federal Claims made a clear error in its judgment here. *Ind. Mich. Power Co.*, 422 F.3d at 1373 (internal quotation marks and citation omitted); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1232 (Fed. Cir. 2004) (finding no clear error where the Court of Federal Claims' denial of injunctive relief was supported by record evidence and appellant merely asked us "to reweigh the relative harms . . . and find in its favor").

Third, Meridian contends that the Court of Federal Claims erred because its conclusion was based on an

---

[9] Meridian separately alleges that Mr. Chickey "was not accepted by the [Court of Federal Claims] as an expert," such that his testimony should not be relied upon. Appellant's Br. 36. The Court of Federal Claims commented in a supplemental hearing during trial, at which Mr. Chickey testified, that Mr. Chickey was considered an "expert[]." J.A. 3411. Because Meridian does not challenge that finding on appeal, we accept the Court of Federal Claims' determination and may rely on Mr. Chickey's testimony.

improper finding that "a reasonable contractor would have conducted an independent soils investigation." Appellant's Br. 29. Meridian incorrectly summarizes the Court of Federal Claims' findings. The Court of Federal Claims did not state that a reasonable contractor would make an independent soils investigation. It stated that "a reasonable contractor would want to investigate whether there were unstable, saturated conditions upstream" because the work site was in a floodplain and the plan drawings showed saturated soil with no bearing capacity as needed for the project, and "[a] site visit also would have made these conditions known, because large portions of saturated, alluvial soil were located '100 feet or so' away from" the proposed worksite. *Meridian I*, 122 Fed. Cl. at 409. The underlying contractual information available to Meridian, along with its ability to visit the site and visually assess the ground conditions, support the Court of Federal Claims' finding that, based on the Contract and "all information available," *Int'l Tech. Corp.*, 523 F.3d at 1349 (internal quotation marks and citation omitted), the ground conditions would have been reasonably foreseeable. Indeed, here, Meridian was aware that "[m]onsoons are a common occurrence at the project site during the summer months." *Meridian I*, 122 Fed. Cl. at 391 n.13 (citing Mr. Sutton's testimony). The Court of Federal Claims did not impose an improper requirement for investigation of the site conditions beyond what a reasonable contractor would undertake here.

Fourth, Meridian argues that the Government's "various modifications to address the soils issues" by the CO acts as an admission that a Type I DSC claim exists. Appellant's Br. 38; *see id.* at 38−39. However, we have stated that "in court litigation, a contractor is not entitled to the benefit of any presumption arising from the [CO]'s decision. De novo review precludes reliance upon the presumed correctness of the decision." *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994); *see Renda*

*Marine*, 509 F.3d at 1378 n.1 (citing *Wilner* for the proposition that "a CO's decision to award additional compensation is not binding upon the agency in subsequent CDA litigation"). While the CO issued several contract modifications following the award of the Contract to Meridian, *see Meridian I*, 122 Fed. Cl. at 387−90, the Court of Federal Claims explained that Meridian failed to show "by a preponderance of the evidence" that all four elements of the DSC claim were met, and gave sufficient reasoning for its finding, *id.* at 409; *see id.* at 406−09. We conclude the Court of Federal Claims did not err in its analysis of the second element of the Type I DSC claim.

### D. Meridian's Defective Pipe and Dewatering Specification Claims

The Court of Federal Claims found that Meridian's defective pipe and dewatering specification claims were so intertwined with its DSC claim that they constituted a single claim. *Id.* at 405. Meridian contends that analyzing its defective pipe and dewatering specification claims as part of the DSC analysis was error. Appellant's Br. 40−49. We address each claim in turn.

#### 1. The Defective Pipe Specification Claim

Meridian alleges that "[e]ven if Meridian had not encountered a [DSC], it is entirely possible that Meridian would be entitled to recover damages incurred as a result of the defective pipe specification alone." *Id.* at 46. We disagree with Meridian.

We have previously stated:

Although [DSC] and defective specifications claims are distinct in theory, they collapse into a single claim . . . where the alleged defect in the specification is the failure to disclose the alleged [DSC]. Where the [DSC] claim and the defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed

by the specific [DSC] clause and the cases under that clause.

*Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002).

The Specification called for Class IV unlined pipe to be used in the sewer relocation project. J.A. 1449; *see* J.A. 1446–47. Upon installation, the Class IV pipe bowed and Meridian had to "remove and reinstall" the pipe with stronger Class V pipe. J.A. 357. Meridian admits that the bowing of the pipe "was undoubtedly exacerbated" by the purported DSC, "i.e., the unanticipated subsurface soil conditions." Appellant's Br. 45 n.7. However, it incorrectly states that the "problems . . . were certainly in part attributable to the defective specifications," *id.*, because all of the discussions on the inadequacy of the Class IV pipe stem from the discovery of the soft subsurface conditions that also form the basis for Meridian's DSC claim, *see* J.A. 357–58 (providing admission by Meridian that the "amount of water coming down" through the soil contributed to pipe bowing), 646 (providing statement by Meridian's witness that bowing was caused by water coming through "voids of larger grain materials" in the soil to "complete[] the liquification of the crazy soft material adjacent to the pipe"); *see also* Appellant's Br. 14–15 (citing J.A. 2498 (stating, in Government's After Action Review, that the "[w]rong [c]lass of pipe [was] specified" because it was "not adapted to site constraints")). Therefore, we agree with the Court of Federal Claims that Meridian's defective pipe specification claim is "so intertwined" with its DSC claim as to constitute a single claim. *Comtrol*, 294 F.3d at 1362.

Meridian's counterarguments are unpersuasive. To the extent Meridian argues that the Specification was defective because it should have required a contractor to provide Class V pipe, *see* Appellant's Br. 43 (stating that the Arizona Department of Environmental Quality

("ADEQ") "required Class V pipe"), we do not find sufficient evidence in the record to support this claim. The Government's witness stated that Class IV was "right on the line of being adequate," J.A. 567, and that Class IV was not "the wrong pipe" because alterations could have been made to compensate for the later-discovered issues and satisfy ADEQ requirements, J.A. 496. Meridian has not presented evidence that, given the information in the Specification, Class V was required. Rather, it claims that the purported DSC caused Class IV pipes to be inadequate.

Meridian also contends that the Specification was defective because the design drawings called for Class V pipe, J.A. 1725, such that the discrepancy itself constitutes error, *see* Appellant's Br. 43. This argument is without merit. The Contract states that "[i]n case of difference between drawings and specifications, the specifications shall govern." J.A. 1156. Meridian does not challenge this unambiguous contract language. *See generally* Appellant's Br. Moreover, if the documents were on their face ambiguous, as Meridian alleges, Meridian "ha[d] a duty to seek clarification of a patent ambiguity" on this basis. *Comtrol*, 294 F.3d at 1365 (citations omitted). It is undisputed that Meridian failed to inquire about the discrepancy before bidding. *See* J.A. 1760 (providing evidence that Meridian asked for clarification post-award of Contract). Therefore, Meridian cannot establish the discrepancy as a basis for its DSC claim.

2. The Defective Dewatering Specification Claim

In a footnote, the Court of Federal Claims found that the dewatering requirements in the Specification were *performance* requirements, rather than *design* requirements. *Meridian I*, 122 Fed. Cl. at 406−07 n.30; *see Blake Constr. Co. v. United States*, 987 F.2d 743, 745 (Fed. Cir. 1993) (detailing differences between design and performance specifications). Therefore, the Court of Federal

Claims reasoned that Meridian had "discretion to deviate from the specifications," and any deviation from the representations in the dewatering specification would not be cause for a defective specification claim. *Meridian I*, 122 Fed. Cl. at 406 n.30.

Meridian argues that the dewatering specification is a design specification, not a performance specification, and therefore the Court of Federal Claims was required to consider it separately from a DSC analysis. Appellant's Br. 46−49; *see* J.A. 1628−31. However, Meridian does not contest that the underlying allegations related to the purported defective dewatering specification are so intertwined with the DSC claim as to constitute a single claim. *See generally* Appellant's Br. Nor does Meridian argue that *Comtrol*'s instruction to treat DSC and defective specification claims as a single claim would not apply to its dewatering specification claim, regardless of whether the dewatering specification is categorized as a performance or design specification. *See generally id.* Therefore, we reject the argument that the Court of Federal Claims erred in determining that Meridian's defective dewatering specification claim fails under the DSC analysis.[10]

---

[10]    Even if we were to review the dewatering specification's classification, we would not find that the Court of Federal Claims erred. The dewatering specification unequivocally states that "[a]ll permanent construction shall be carried on in areas free from water." J.A. 1629. However, it leaves the means by which to accomplish this objective to the discretion of the contractor. *See* J.A. 1629 (ordering the contractor to submit a proposal "showing the method that he *proposes to use* to divert water" (emphasis added)), 1629 (ordering contractor to, in its plans "describ[e] the *proposed* methods to protect each construction work area[] from storm runoff" (emphasis added)), 1630

## IV. The Court of Federal Claims Provided Insufficient Analysis for Meridian's Flood Event Claim (Count IV)

Meridian sought additional damages below that it purportedly accrued "due to the [Government's] modifications and specification defects" that caused delay and forced Meridian to work in "inclement weather" conditions. *Meridian I*, 122 Fed. Cl. at 410 (internal quotation marks and citation omitted); *see* J.A. 3015–21 (Count IV). The Court of Federal Claims denied the claim, finding that "the doctrine of accord and satisfaction bars Meridian's claims that the [Government] is responsible for costs incurred for delays caused by flood events." *Meridian I*, 122 Fed. Cl. at 412. The Court of Federal Claims based its analysis on the accord and satisfaction standard discussed in *Community Heating & Plumbing Co. v. Kelso*, which states that:

> Discharge of a claim by accord and satisfaction occurs when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim. However, courts may refuse to bar a claim based upon the defense of accord and satisfaction where the parties continue to consider the claim after the execution of a release.

987 F.2d 1575, 1581 (Fed. Cir. 1993) (citations omitted). The Court of Federal Claims found that two bilateral contract modifications executed in September 2008, which

---

("The Contractor *shall submit the method* of dewatering to [CO] *for his approval*." (emphases added)). Because the Specification does not "describe in precise detail the materials to be employed and the manner in which the work is to be performed," it is properly considered a performance specification. *Blake Constr.*, 987 F.2d at 745.

claimed that the modifications "reflect[] all credits due the Government and all debits due the Contractor . . . for all costs and markups directly or indirectly attributable for the change ordered," J.A. 3122, 3151, constituted accord and satisfaction with respect to the flood events claim, *Meridian I*, 122 Fed. Cl. at 411–12. As part of its analysis, it further found that the Government's "draft modification," dated August 2009, which considered additional estimates for flood damage, did not negate the findings of satisfaction because Meridian did not allege that the "internal memorandum was known by Meridian prior to discovery," such that the memorandum could not be evidence that "the parties" continued to negotiate the claims. *Id.* at 412.

Meridian asserts that the defense of accord and satisfaction for Count IV[11] should be barred because the parties continued to consider the claim after the bilateral modifications, and the Court of Federal Claims' finding to

---

[11] Meridian also contests the Court of Federal Claims' determination that Count V (Differing Site Conditions) of Meridian's Second Amended Complaint was barred by accord and satisfaction. *See* Appellant's Br. 54–57. Because we affirm the Court of Federal Claims' determinations that Count V fails on its merits, *see supra* Section III, we need not consider the Court of Federal Claims' alternative holdings with respect to the affirmative defense of accord and satisfaction for Count V, *see Meridian I*, 122 Fed. Cl. at 410 (holding that "even if, *arguendo*, the sewer line were a [DSC]," certain modifications "constituted accord and satisfaction"); *see also Holland v. United States*, 621 F.3d 1366, 1382 (Fed. Cir. 2010) (concluding accord and satisfaction barred appellants' breach of contract claims "[i]n the alternative" after affirming that appellants failed to satisfy elements for breach of contract).

the contrary is clearly erroneous. *See* Appellant's Br. 52−53. Meridian contends that the continued drafting of Government estimates for flood damage, "even absent any 'negotiations' with Meridian[,]" indicates that the Government "did *not* believe there had been a release or abandonment [of] Meridian's claims." *Id*. at 53. Meridian further argues the Court of Federal Claims erred because it did not use the four-part standard for accord and satisfaction as articulated in *Holland*. *See id*. at 48−51; *see also* 621 F.3d at 1382. We find the Court of Federal Claims provided insufficient analysis of this defense.

Accord and satisfaction has been "aptly described" as a four-part test of "proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Brock & Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965) (internal quotation marks and citation omitted); *see Holland*, 621 F.3d at 1382 (citing to *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002) for the same proposition, which in turn cites to *Brock & Blevins*, 343 F.2d at 955). While *Community Heating* does not use the term "meeting of the minds," *see generally* 987 F.2d 1575, its discussion of parties' continued consideration of a claim after execution of a release forms part of this inquiry for purposes of the accord and satisfaction doctrine, *see id*. at 1581 (citing *Brock & Blevins*, 343 F.2d at 955). The Court of Federal Claims erred in its analysis of the meeting of the minds part of the accord and satisfaction claim when it analyzed whether the parties "continue[d] to consider the claim after execution of a release." *Id*. at 1581 (citation omitted).[12]

_____

[12] The Court of Federal Claims further erred by not reviewing the other challenged element of the accord and satisfaction claim. *See Holland*, 621 F.3d at 1382. Meridian contested the elements of "meeting of the minds" and

The Court of Federal Claims solely considered whether Meridian *knew of* the August 10, 2009 Government draft modification in determining whether the parties continued to consider the flood events claim. *See Meridian I*, 122 Fed. Cl. at 412 (stating Meridian does not allege and the record does not support finding that the Government's "internal memorandum was known by Meridian prior to discovery"). It failed to consider additional evidence on record showing that the Government directed Meridian to submit revised estimates for the flood claim on multiple occasions after the execution of the bilateral modifications, *see* J.A. 2486, 2491−93, to which Meridian did not respond, *see, e.g.*, J.A. 2492−93 (stating, in a price negotiation memorandum on flood event damage dated September 2009, that "[n]egotiations could not be entered into because the Contractor failed to respond to the request for data" such that "[t]he modification will be issued unilaterally"). It also did not consider the content of the Government's draft modification and supporting documentation to determine the Government's intent in draft-

---

"proper subject matter" below, J.A. 901−02; *see King Fisher Marine Serv., Inc. v. United States*, 16 Cl. Ct. 231, 236−37 (1989) (stating "proper subject matter" requires showing the subject matter of the modification is the same as that of the disputed claim), and we agree that the other two elements have been satisfied, *see Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed. Cir. 1987) (defining the element of "competent parties" to require that the officials with whom an agreement is made had "authority to bind the Government"); *Bogley's Estate v. United States*, 514 F.2d 1027, 1033 (Ct. Cl. 1975) (defining the element of "consideration" as "detriment incurred by the promisee, or a benefit received by the promisor" (citation omitted)). On remand, the Court of Federal Claims shall consider meeting of the minds and proper subject matter.

ing the revisions, *see* J.A. 2484−93, or evidence that Meridian submitted additional requests for equitable adjustment after the 2008 releases that included adjustments on the flood events claim, and that the Government acknowledged receipt and planned review of those submitted adjustments in 2010, *see* J.A. 2510.

In our precedent on accord and satisfaction, we have never held that the affirmative defense of accord and satisfaction may only be barred with evidence of formal draft modifications negotiated between parties after a release's execution. Indeed, in several cases, we have found accord and satisfaction barred when a contractor submitted a proposed claim before the execution of a release, and only one party, the Government, responded in some fashion after execution. *See, e.g., England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 850 (Fed. Cir. 2004); *Winn-Senter Constr. Co. v. United States*, 110 Ct. Cl. 34, 65−66 (1948). The predecessor to the Court of Federal Claims has also reviewed testimony by one or more parties to determine intent with respect to a release or considerations of a claim subsequent to a release. *See, e.g., A & K Plumbing & Mechanical, Inc. v. United States*, 1 Cl. Ct. 716, 723 (1983), *aff'd*, 795 F.2d 1011 (Tbl.) (Fed. Cir. 1986).

Thus, the Court of Federal Claims' assumption that Meridian had to have known of the proposed draft modification for the meeting of the minds requirement improperly applied the law on accord and satisfaction. Our precedent on the meeting of the minds inquiry accepts a wide range of evidence in its fact-specific consideration. Accordingly, we remand for the Court of Federal Claims to consider whether the parties reached a meeting of the minds on the flood event claims in light of all of the evidence. *See Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1274 (Fed. Cir. 2008) (remanding for Court of Federal Claims to apply a proper legal analysis); *Cienega Gardens v. United States*, 503 F.3d 1266, 1291 (Fed. Cir.

2007) (similar). The Court of Federal Claims may conclude that the claims are barred by accord and satisfaction on remand, but we are unwilling to say, based on the Court of Federal Claims' reasoning, that this is so without further review.

V. The Court of Federal Claims Erred When It Denied Meridian's Unpaid Contract Quantities Claim (Count VI)

Meridian sought damages for "unpaid contract quantities" of certain items purchased in excess of original contract estimates in the amount of $358,913.63. *Meridian I*, 122 Fed. Cl. at 412−13; *see* J.A. 2301. The Court of Federal Claims found that Meridian was entitled to "payment for items used" but was not entitled to payment beyond what the Government had already made because the Government "[wa]s entitled to withhold payment." *Meridian I*, 122 Fed. Cl. at 413 (quoting FAR 52.232-5 (Payments Under Fixed-Price Construction Contracts) ("[I]f satisfactory progress has not been made, the [CO] may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved.")). Meridian argues that the Court of Federal Claims "erred when denying Meridian's unpaid contract quantities claim" because, inter alia, here, "there has been no assertion of unsatisfactory progress." Appellant's Br. 58, 60 (capitalization modified). It further argues that the Government cannot claim its right to set off in withholding the unpaid contract quantities because the Court of Federal Claims did not properly analyze the amount allegedly owed to Meridian in relation to the Government's proposed set off. *See* Reply Br. 27−28. We agree with Meridian.

First, the Court of Federal Claims found the Government was entitled to withhold up to 10% of payment based on FAR 52.232-5. *Meridian I*, 122 Fed. Cl. at 413. However, this FAR provision, while incorporated into the Contract, only applies to periods with "progress payment,"

J.A. 1137, which is not applicable to the unpaid contract quantities identified by Meridian, *see* FAR 52.232-16 ("The Government will make progress payments to the Contractor *when requested as work progresses . . . .*"); J.A. 183 (Court of Federal Claims: "[T]he requirements of complying with the outline [of payment] as applied to progress payments don't apply." Government: "Sure."), 214 (Court of Federal Claims: "[A]bsent any other indication incorporating those payment provisions involving estimates of work done, we don't have an indication in the contract to the contractor that the progress payment provisions will apply."). Indeed, the Government abandoned its arguments related to the progress payment provisions with respect to the unpaid contract quantities after the partial summary judgment phase of the trial. *Compare* J.A. 166–214 (setting forth the Government's arguments on progress payments at the hearing on motion for summary judgment), *with* Def.'s Trial Br. at 82, *Meridian v. United States*, No. 1:11-cv-00492-SGB (Fed. Cl. Sept. 18, 2014), ECF No. 122 (hereinafter "Gov't's Post-Trial Br."). Moreover, withholding is only allowable if "satisfactory progress has not been made" on a contract, FAR 52.232-5, but the Government has conceded that "unit priced quantity work was generally done" and there was no allegation of unsatisfactory performance that would merit withholding, *Meridian I*, 122 Fed. Cl. at 413 (internal quotation marks and citation omitted); *see* Appellee's Br. 54 ("[T]he Government acknowledged that Meridian was entitled to a small amount of additional funds for unpaid quantities associated with channel improvements . . . .").[13]

---

[13] For the same reasoning, the Court of Federal Claims' citation to *M.C. & D. Capital Corp. v. United States*, which applies the provisions of FAR 52.232-5, would not apply here, *see Meridian I*, 122 Fed. Cl. at 413

The Court of Federal Claims also cited in part to *Johnson v. All-State Construction, Inc.* to support its holding supporting the Government's refusal to pay any of the alleged unpaid contract quantities. *Meridian I*, 122 Fed. Cl. at 413 (citing 329 F.3d 848, 854 (Fed. Cir. 2003)). The Government on appeal relies on *Johnson* to argue that it "was entitled to set off overpayments." Appellee's Br. 55. In *Johnson*, we affirmed the Government's withholding of certain payments based on the Supreme Court's directive that "[t]he [G]overnment has the same right [of set off] which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." 329 F.3d at 852 (quoting *United States v. Munsey Tr. Co.*, 332 U.S. 234, 239 (1947)).

Meridian does not contest that the Government has a common law right to a set off, rather, it argues that "the amount of any potential set[]off" was not established by the Government at trial because the issue was not addressed in the quantum phase. Reply Br. 27. The Government, which also argued before the Court of Federal Claims that the issue would be "resolved at the damages portion of trial," Gov't's Post-Trial Br. 82, presented evidence in the form of its expert Mr. Stephen Weathers's report that the Government overpaid Meridian for contract items by $326,642.32, J.A. 3239; *see* J.A. 3227−39. Meridian claimed in detail damages for unpaid contract quantities in the amount of $358,913.63. J.A. 3030−32 (Second Amended Complaint); *see* J.A. 2301−13 (detailing alleged unpaid quantities).

The Court of Federal Claims did not provide any analysis of the parties' varying cost estimates to explain why it found that Meridian had not shown by a prepon-

---

(citing 948 F.2d 1251, 1257 (Fed. Cir. 1991)), because satisfactory progress has been made.

derance of the evidence it was entitled to the amount claimed. *See Meridian I*, 122 Fed. Cl. at 413 (stating, in a conclusory fashion after discussing legal standards for set off, "[f]or these reasons, the court has determined that the Government did not breach the September 21, 2007 Contract based on alleged unpaid contract quantities"). We are not inclined to resolve facts in the first instance. *See Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) ("[W]e are a court of review, not of first view."). Therefore, we find the Court of Federal Claims clearly erred in dismissing Meridian's unpaid contract quantities claim, in light of the conflicting information contained in the Second Amended Complaint and Mr. Weathers's testimony. *See Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1376 (Fed. Cir. 2011) (remanding damages award where Court of Federal Claims erroneously "concluded that it was not required to apply" a "detailed inquiry" to a factual question it should have decided in the first instance). Count VI is therefore remanded to the Court of Federal Claims for further review.

## CONCLUSION

We have considered Meridian's remaining arguments and find them unpersuasive.[14] We vacate and remand the Court of Federal Claims' findings in *Meridian I* on Counts IV and VI, reverse and remand the Court of Federal

---

[14] Meridian states in a conclusory manner that because "[i]t is now clear that the [Government] did, indeed, fail to pay Meridian even those sums that it agreed Meridian was owed," the Court of Federal Claims "erred in denying Meridian's good faith and fair dealing claim [(Count XIV)]." Appellant's Br. 62. "[M]ere statements of disagreement with the [trial] court as to the existence of factual disputes do not amount to a developed argument." *SmithKline Beecham*, 439 F.3d at 1320. Accordingly, we find this argument waived.

Claims' interest calculation in *Meridian II*, and affirm the remainder of the decisions. Accordingly, the Final Decisions of the U.S. Court of Federal Claims are

**AFFIRMED-IN-PART, VACATED-IN-PART, REVERSED-IN-PART, AND REMANDED**

COSTS

Each party shall bear its own costs.